Filed 8/18/15  P. v. Palacios CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANGEL RAY PALACIOS et al.,<br><br>Defendants and Appellants. | C071180<br><br>(Super. Ct. No. CRF103977) |

Defendants Angel Ray Palacios, Carlos Angel Hernandez-Chavarin (Hernandez), and German Ornelas Martinez were caught riding in Hernandez's car with an AP-9 assault firearm.  They were convicted of transportation and possession of an assault weapon for the benefit of a criminal street gang.  (Former Pen. Code, §§ 12280, subd. (a)(1), 12276, and Pen. Code, § 186.22, subd. (b)(1); undesignated statutory references are to the Penal Code.)  Hernandez was also convicted of firearm possession by a felon and in violation of a court order.  (§§ 667, subds. (a)(1), (c) & (e)(1), 12021, subds. (a)

1

and (d) , 1192.7.)  With each defendant joining in material contentions of the others, defendants argue (1) the trial court erred in allowing improper gang expert testimony; (2) evidence of gun transportation was insufficient; (3) evidence that the weapon was possessed for the benefit of a criminal street gang was insufficient; (4) there was instructional error; and (5) the prosecutor committed misconduct in his opening statement.  Palacios and Martinez also assert sentencing error.  We affirm all three judgments.

FACTS AND PROCEEDINGS

On August 18, 2010, in the early afternoon, a high school security guard saw two groups wearing red approach each other in a park next to the school and start fighting. All three defendants were involved, standing a few feet from each other.  The guard was familiar with all three, having broken up a previous gang fight involving Palacios and Martinez, and having previously tried to talk Hernandez out of involvement in the Norteño criminal street gang.  The major Norteño gang in town was of the Varrio Bosque subset and wore red.

On this occasion, the guard ran towards the melee and saw Hernandez exchange punches with a large male wearing his hair in a ponytail.  The latter separated from Hernandez and said, "if you got the balls, fuckin' use it."  The guard saw something dark in Hernandez's hand.  The trial court allowed the guard to testify he thought the object was a weapon, not for the truth but to explain his actions.  The object was neither too big nor too small to be the firearm in evidence.  The guard knocked the ponytailed man down, held him to the ground and called 911.  The others ran away.

Defendants got into Hernandez's two-door Chrysler and agreed to give 14-year-old Jose S. a ride.  Defendants were 18 to 19 years old.  They drove away, with Hernandez driving, Palacios in the front passenger seat, Martinez in the rear seat behind the driver, and Jose in the rear seat behind Palacios.

2

Police in a patrol car responding to a call about people dispersing from the fight in the park, stopped Hernandez's car, determined defendants were on probation, conducted a vehicle search, and found an unloaded assault firearm under the front passenger seat. The weapon was a semi-automatic pistol with a threaded barrel with a flash suppressor and a shroud to keep the heat away from the shooter. Without the magazine, the gun is about 13 inches by six inches. The magazine is about eight inches long. The gun is an AP-9 "knock off" of the similar TEC-9, and both terms were used at trial. There were no useable fingerprints found on the weapon.

Next to the gun the police found the 10-inch magazine loaded with 24 bullets. The gun could have been easily loaded in a matter of seconds by clipping the magazine into the gun. Police also found in the car a case of beer and cell phones claimed by Palacios and Martinez. Martinez's phone had a photo of the gun found in the car. Palacios's cell phone had photos and videos, shown to the jury, of himself and other gang members known to police holding or passing the gun around.

Jose testified at trial that he came upon the fight in the park after school. Neither he nor defendants participated in the fight. Jose saw the defendants in a parked car and knew who they were, so he asked them for a ride. Jose did not see a gun when he got in the car. When the police pulled the car over, Palacios threw a gun to Jose, who was scared and threw it on the floor and kicked it under the seat. Jose initially told police he knew nothing about a gun. He did not want to be a snitch and did not want to get blamed for the gun. Jose did not recall statements he made about the gun in a second police interview. The video of that interview was played for the jury. In it, Jose said that, when he and his companions noticed the police car following them, Palacios handed a gun to Jose. Jose was scared. He threw the gun down and kicked it under the seat. Jose had seen Palacios with the gun on one prior occasion.

The jury heard recorded police interviews in which Hernandez said he was affiliated with the "Northerners," and Palacios said he hung out with Northerners.

Palacios agreed the gun was big enough that it would be hard not to notice but answered "Maybe" when asked if he agreed everyone in the car must have noticed the gun.

Police officer Ronald Cordova testified as a gang expert and explained his reasons for concluding each of the three defendants is a Norteño gang member, e.g., their admissions, prior contacts with police, gang tattoos, and cell phone videos. Among the reasons as to Palacios was that he was involved with other Norteños in an assault on a Sureño gang member at a 7-Eleven in January 2011, after the August 2010 incident at issue in this prosecution. Hernandez participated with other Norteños in a physical fight with Sureño gang members at a Bel Air shopping center in 2007.

The expert also testified the assault weapon in this case was particularly useful to gangs because its size and magazine capacity make it more intimidating than other guns. Answering hypothetical questions mirroring the facts of the case, the expert opined a gang member bringing such a gun into a car with other gang members would tell the others he had the gun, out of pride, to gain the respect of his peers, and to show a willingness to commit violent acts on behalf of the gang. Gang culture has a "ride or die" tenet that all gang members in the car be willing to use the gun if needed. Gang members possess such a gun to benefit the gang by promoting their gang through videos, indoctrinating new members by having them use the weapon, and intimidating rivals.

The defense called as witnesses two persons who said defendants did not participate in the fight.

Palacios testified at trial. He said all three defendants are validated Norteño gang members, but only he is an active member of Varrio Bosque. He hates Sureños because a few years ago they ran over his good friend, Martinez, breaking his hip. Palacios admitted he had been in fights with Sureños but denied involvement in the incidents at 7-Eleven and the Bel Air parking lot.

4

Palacios bought the AP-9 for $700, knowing it was illegal. He never used it against anyone. He showed off the gun to his friends and let them handle it, as depicted in his cell phone photos and video.

The day before this incident, Palacios was fired from his job when he failed a drug test. To avoid anticipated ire of his father, he avoided being home when his father was there. The next morning, he retrieved the gun and concealed it in his waistband under a large football jersey. He returned to a friend's house, got into the front passenger seat of Hernandez's car, placed the gun partially under the seat, and honked the horn. Hernandez came out, and they drove away. They later returned and picked up Martinez. They drove to the park and watched the fight. They agreed to give Jose a ride. They stopped at a store to buy beer.

As they continued driving, Palacios noticed the police car following them and tossed the gun onto Jose's lap, thinking the consequences would be less severe for Jose. Palacios said he had not mentioned the gun and did not believe anyone else in the car was aware of its presence before he tossed it into the back seat. He did not intend to use it and brought it with him only so his father would not find it.

The jury returned verdicts finding all three defendants guilty as charged and finding true the gang enhancement allegations. The jury also found Hernandez guilty on the third count, possession of firearm in violation of a court order (§ 12021, subd. (d)), the fourth count of possession of a firearm by a felon (§ 12021, subd. (a)(1)), and found true the gang enhancement allegations.

The trial court sentenced Palacios to 14 years in prison: The upper term of eight years for the transportation, plus four years for the gang enhancement, with sentence stayed for the possession count (§ 654), plus a two-year consecutive sentence on an unrelated drug offense case.

The court sentenced Hernandez to a total aggregate term of 26 years in prison: The upper term of eight years for transportation, doubled to 16 years due to the prior

strike, plus four years for the gang enhancement, plus a consecutive five-year term under section 667, subdivision (a)(1), with sentence stayed on the simple possession count, plus a consecutive one-year sentence for the unrelated battery case.

The trial court denied Martinez's motion for new trial claiming insufficiency of the evidence and sentenced him to seven years in prison: The lower term of four years for transportation, plus three years for the gang enhancement, with sentence stayed on the possession count.

DISCUSSION

I

*Claim of Prosecutorial Misconduct in Opening Statement*

Palacios and Hernandez seek reversal on the ground the prosecutor committed misconduct in opening statement. We do not find basis for reversal.

A.     Background

The prosecutor began his opening statement by showing the jury excerpts of defendants' cell phone videos. He then displayed and, over defense objection, read aloud the following language of section 186.21: "The State of California is in a state of crisis, which has been caused by violent street gangs, whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." The prosecutor then moved on to the evidence the jury would hear.

The prosecutor also said in opening statement, "Mr. Palacios further shows commitment [to] the gang when he's released on bail. At one point committed an assault with another Norteño gang member, Rafael Ramos at the --." The trial court overruled a defense objection. The prosecutor continued: "At the 7-Eleven, corner of East and Main after he was arrested in this case further showing his commitment to the gang. The gang

6

expert's testimony will talk about the importance of respect and how gang benefit [*sic*] from crimes."

Defendants moved for a mistrial, arguing (1) the statutory language demonized them as terrorists, and (2) the subsequent incident had not yet been adjudicated and should be excluded as inflammatory.

The prosecutor argued these matters would come out during the gang expert's testimony.

The trial court noted it had not yet ruled on the People's motion to allow the expert to mention the subsequent incident, "but I don't find that there was any misconduct in mentioning it," because gang-related incidents before and after arrest in this case were relevant on the question of gang membership at the time of the current charges. That Palacios was on bail was not something that could be introduced through the gang expert, "[b]ut frankly, since the jury is going to hear the defendant was arrested for this crime and . . . there's another incident when the defendant is out of custody, I do not find that passing reference to being out on OR or bail, whatever it was, warrants a mistrial."

The court ruled the prosecutor's use of statutory language should have been reserved for closing argument, but it did not warrant a mistrial, because the court informed the jurors that opening statements were not evidence, and there was no issue of denial of defendant's right to confrontation. Defense counsel noted a different judge in an unrelated case had stopped this prosecutor from using the statute in opening statement. The court noted it had allowed this prosecutor to do so in a prior case.

B.    *Analysis*

We review denial of a mistrial motion for abuse of discretion. A motion for a mistrial should be granted only when the defendant's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) The scope of trial court discretion always resides in the confines of the applicable legal

principles.  (*People v. Parmar* (2001) 86 Cal.App.4th 781, 792-793.)  Defendants' claim of prosecutorial misconduct presents a question of law on undisputed facts, triggering de novo review.  (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.)  We explain any error was harmless under federal and state law.

Prosecutorial misconduct violates a defendant's federal constitutional rights when it comprises a pattern of conduct so egregious that it infects the trial with unfairness as to make the resulting conviction a denial of due process.  (*People v. Bennett* (2009) 45 Cal.4th 577, 594-595 (*Bennett*).)  Conduct that does not render a trial fundamentally unfair is error under state law only when it involves the use of deceptive or reprehensible methods to attempt to persuade the court or the jury.  (*Ibid*.)  Assuming misconduct, it does not require reversal absent prejudice to the defendant.  (*People v. Cash* (2002) 28 Cal.4th 703, 733.)  The federal standard is whether the misconduct was harmless beyond a reasonable doubt.  (*People v. Williams* (2013) 58 Cal.4th 197, 274.)  The state standard is whether it is reasonably probable the defendant would have obtained a more favorable result absent the error.  (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1324.)

Here, the prosecutor's comment about Palacios committing another crime while on bail was a fair comment supported by the evidence, because the gang expert considered that incident in reaching his opinion.

However, it was arguably inappropriate for the prosecutor to comment that California is in a crisis of gangs terrorizing peaceful citizens.  The prosecutor may comment on the serious and increasing menace of criminal conduct and the necessity of a strong sense of duty on the part of jurors.  (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 513 [prosecutor's references to restoring order to the community were a proper appeal to the jury to take its duty seriously]; see also, *People v. Cornwell* (2005) 37 Cal.4th 50, 91-92 [prosecutor's remarks about discipline being the cornerstone of freedom and the need for law and order to prevent chaos did not urge the jury to convict

8

based on fear of chaos and crime in the community, but to act with an understanding of the importance of the law in the abstract], overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

But the prosecutor may not appeal to the passion and prejudice of the jurors. The World War II case of *Viereck v. United States* (1943) 318 U.S. 236 [87 L.Ed. 734], held in dictum that a prosecutor crossed the line in a prosecution for violation of the Foreign Agents Registration Act, by arguing to the jury that "This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death. . . [¶] . . . [¶] The American people are relying upon you ladies and gentlemen for their protection . . . ." (*Id*. at pp. 247-248.)

" 'A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.' " (*United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149 (*Weatherspoon*).)

*Weatherspoon* reversed a conviction for felon-in-possession of a firearm because the prosecutor improperly vouched for the credibility of law enforcement officers' testimony and urged the jury to convict in order to alleviate societal problems. On the latter point, the prosecutor repeatedly, and in violation of the trial court's direction to stick to guilt or innocence, argued to the jury that convicting the defendant would " 'make you comfortable knowing there's not convicted felons on the street with loaded handguns,' " and " 'finding this man guilty is gonna protect other individuals in this community.' " (*Weatherspoon*, *supra*, 410 F.3d at p. 1149.) Although the prosecutor did not engage in "the even more egregious offense" of " 'pointing to a particular crisis in our

9

society and asking the jury to make a statement,' " guilt depended on proof that the defendant was in possession of a gun in a car pulled over by police, and the prosecutor's argument was clearly designed to encourage the jury to enter a verdict based on emotion. (*Id*. at pp. 1149-1150.)

*Weatherspoon* held the misconduct prejudicial. Whatever curative statements the trial judge provided were inadequate and could not be salvaged by the later generalized jury instruction that lawyers' statements are not evidence. (*Weatherspoon*, *supra*, 410 F.3d at p. 1151.) The case against the defendant was not particularly strong and depended on witness credibility, which increased the prejudicial effect of the prosecutor's improper vouching. (*Ibid*.)

Here, even if we were to assume for the sake of argument that the prosecutor crossed the line, and the trial court erred in allowing it, the prosecutor's arguable misconduct did not prejudice defendants under the more strict federal standard for reversible misconduct and, consequently, did not prejudice defendants under the state standard.

In assessing prejudice under the federal standard, the reviewing court considers the potential for prejudice in the context of the entire trial and looks at the jury instructions and the strength of the case against defendants. (*Weatherspoon, supra*, 410 F.3d at p. 1151.)

Here, defendants cite no statement by the prosecutor urging the jury to convict defendants because of the crisis of gangs terrorizing citizens. The prosecutor merely read the statute and moved on. The trial court later instructed the jurors they were to decide the case based on the evidence, not based on bias, sympathy, prejudice or public opinion, and the lawyers' statements were not evidence. The case against defendants was strong -- including their gang connections, cell phone photos and videos of the gun, the gang fight at the park, and the expert's testimony on gang culture. It is inconceivable that the

10

jury convicted any of the defendants, guilty or not, based on the prosecutor's quotation of the statute.

Palacios's only argument about prejudice is that he presented a reasonable explanation as to why he possessed the gun (so his father would not find it); he specifically stated it was not for gang purposes; no evidence suggested a plan to use it to commit a crime; and there was no evidence the other occupants of the car knew it was there. Defendants cannot show prejudice by ignoring the evidence against them.

Hernandez argues he was prejudiced because, before the jury heard any evidence, the prosecutor had already demonized him, giving rise to a strong emotional bias against him before the first witness was sworn. Palacios argues in his reply brief that the jurors in this case could reasonably have been expected to believe that, by convicting defendants, the jurors were somehow aiding the solution to a pressing social problem. We are confident the jury was able to follow the court's instruction not to let emotions or any desire to help solve the problem of criminal street gangs in their community regardless of the evidence to rule their decision.

There was no prejudice warranting reversal under the stricter federal standard and accordingly there was no prejudice warranting reversal under the state standard. The misconduct, if any, was harmless beyond a reasonable doubt.

II

*Admissibility of Gang Expert Testimony*

Before addressing defendants' claim concerning insufficiency of the evidence, we consider whether the gang expert testimony was properly admitted.

Hernandez complains the trial court allowed improper gang expert testimony that Hernandez knew Palacios had a gun in the car. The Attorney General, following the prosecutor's lead, responds the testimony was proper opinion as to "expectations of gang members." However, the expert testified about his own expectation, i.e., opinion, as to

11

the likely behavior of a gang member who brings a gun for a drive in a car with other gang members. The expert's opinion was that, because of gang culture, the gun holder is likely to talk and brag about having the gun. We conclude the jury could properly use this evidence in deciding whether Hernandez knew the gun was in the car.

A.    Background

The prosecutor asked the expert witness, "As far as expectations of gang members go, when one gang member has a weapon like that, and let's say they go into a car with other gang members, would it be your expectation, based on all of your training and experience, that that gang member would not tell the other gang members in the car about the gun?" Defendants objected. The prosecutor retorted it was proper to ask the expert about "[e]xpectations of gang members." The court said it would allow the answer if the prosecutor reframed the question as a hypothetical.

The prosecutor did so, putting the facts of the case into a hypothetical, and asked, "even assuming that the other gang members, at the time the gun was brought in, didn't know about the gun, is it your opinion that the gang member who brought the gun to the car would have kept it to himself and not informed his other gang members?"

Over defense objection overruled by the court, the expert witness answered "No." He explained: "There's a variety of reasons why I believe that is possible but not reasonable in a scenario that you gave me. [¶] The first one being the weapon that they possess is not -- well, gang members who possess weapons, like I said before, are very proud of what they are doing and who they are. [¶] Their own gang members are going to know that they are someone who is in possession of a gun because individuals are trying to gain the respect of their fellow gang members while they are a part of this group. [¶] A way of gaining respect is showing your preparedness and showing your willingness to do the gang's work, which includes violent acts.

"My opinion is that having a gun on you or in a car and being a gang member is going to result in some type of a violent act, if an intervention like law enforcement doesn't get it first, basing that on my experience as a gang investigator.

"Knowing that gang members communicate, that they hang out with each other, that they talk all the time, are with -- there are certain groups of them that are with each other on a very regular basis.

"Again, like I said, although it is possible, I don't believe it is reasonable that four guys who are leaving the scene of a fight, who get into a car, and one of them has a weapon as they are leaving the scene of this potential fight from a park, whatever it was, it is not reasonable that only one person is going to know that he has a gun on him and the rest of the guys are going to be driving along, for lack of a better term, with their heads ducked in the sand and completely oblivious to the fact that somebody is in possession of a gun. That's absolutely unreasonable."

The prosecutor then asked: "In these circumstances where there's a substantial gun that's recovered in the company of multiple gang members, is it the expectation that any one of the gang members would use that gun if there was a problem with rival gang members or a need to use it?" The court overruled a defense objection but required the prosecutor to restate the question as a hypothetical. The expert answered "Yes," and explained, "There's a philosophy among this group in particular that I was exposed to early on as a gang cop investigating another case, and it is called ride or die. [¶] And ride or die is simply you are either with us or you are not. There is no being with us part of the time but not all of the time. [¶] A loose translation of ride or die means if one of us are going to get involved and you are with us, you are going to get involved too. [¶] If one of us fight [*sic*] with somebody, if one of us stabs somebody and you are with us, you are expected to act alongside of us because we are united as one group. [¶] So there is an unwritten edict, if you will, that a group of gang members who are together, who may choose to participate in some act, the edict is that you all will act, you will ride with

13

us or you will die.  It is very much alive and well."  The expert added, "Any one of these individuals that you gave me in this hypothetical situation would absolutely be expected to use it if that's what the situation called for."

After direct examination of the expert, Hernandez moved for a mistrial, which the trial court denied, because the expert did not just say the defendants must have known the gun was in the car.

B.        *Analysis*

A person with special knowledge, skill, experience, training, or education in a particular field may testify as an expert witness and give an opinion if the subject matter is sufficiently beyond common experience that the expert's opinion would assist the trier of fact.  (Evid. Code, §§ 720, 801.)  The culture and habits of criminal street gangs meet this criterion, and the prosecution may use hypothetical questions that track the evidence, even if only " 'thinly disguised,' " to establish the crime was gang related.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*).)

 "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.  [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Hernandez argues the abuse of discretion standard does not apply where the erroneous admission of evidence is so prejudicial as to deny due process.  Hernandez is confusing the standard for determining error with the standard for determining whether an error is prejudicial.

Hernandez argues the expert is not a mind reader and cannot testify to what a person in defendant's position knew.  However, a gang expert's testimony about the thought processes of gang members is admissible when rooted in other opinions properly reached about gang culture.  For example, *People v. Hill* (2011) 191 Cal.App.4th 1104,

held a gang expert was properly allowed to testify as to what gang members think and how they behave, specifically, that a gang member would not go into rival gang territory except to shoot or kill a rival gang member, and if the intended target is not there anyone else will do, and killing a police officer sends the ultimate message of gang reputation. (*Id*. at p. 1126; see also, *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384 [approved expert testimony focused on what gangs and gang members typically expect and not on the defendant's subjective expectation].)

Hernandez relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), which held improper a gang expert's testimony that when one gang member in a car possesses a gun, every other gang member in a three-car caravan knows of the gun. (*Id*. at p. 652.) The expert explained his reasoning, i.e., the occupants in all three cars were from the same gang; perpetrators of a drive-by shooting earlier that evening had identified themselves as members of that gang; and any members out driving that night would expect retaliation and would therefore be armed. (*Id*. at p. 652, fn. 7.) The problem in the view of the *Killebrew* court was that the expert testified to the "subjective *knowledge and intent* of each occupant in each vehicle. Such testimony is much different from the *expectations* of gang members in general when confronted with a specific action." (*Id*. at p. 658.) Because the expert's testimony was the only evidence of knowledge and intent, it did nothing more than inform the jury how the expert believed the case should be decided. (*Ibid*.)

The California Supreme Court has since said *Killebrew* has "limited significance" because it did not explain how the expert, who testified through hypothetical questions, was testifying about the specific defendant on trial in that matter. (*Vang, supra*, 52 Cal.4th at p. 1047, citing *People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3 ["It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons"].) To the extent *Killebrew* was correct in prohibiting expert testimony about whether specific

defendants acted for a gang purpose, the reason is *not* that such testimony might embrace the ultimate issue in the case (Evid. Code, § 805 [expert testimony is allowed even if it embraces ultimate issue to be decided]), but rather that it is of no assistance to the jurors, who are just as competent as the expert to weigh the evidence and draw a conclusion. (*Vang, supra*, 52 Cal.4th at p. 1048.)

Here, the expert testified only through hypothetical questions, and his focus was not on reading a gang member's mind but rather on (1) the expected behavior of a gang member carrying a gun, i.e., he will talk about it and be proud of it, and (2) the gang "ride or die" culture whereby any of the gang members in the car are expected to use the gun if needed. From this, the jury could reject Palacios's testimony that he concealed the gun, conclude Palacios talked about having the gun in the car, and thereby reasonably infer Hernandez knew he was driving around that day with the gun in the car.

Moreover, in *Killebrew*, the expert's testimony was the *only* evidence establishing the elements of the crime. (*Id.* 103 Cal.App.4th at p. 658.) Here, there is an abundance of other evidence that Palacios shared the gun and knowledge of it with his fellow gang members, including the cell phone video with Palacios narrating about the gun as fellow gang members passed it around and Palacios's testimony that he brought the gun to the gathering to show it off.

The trial court did not abuse its discretion in allowing the expert testimony.

III

*The Evidence was Sufficient to Prove the Gun was Possessed to Promote, Further, or Assist a Criminal Street Gang*

Palacios and Martinez argue there was insufficient evidence that they possessed the gun with the specific intent to promote, further, or assist in any criminal gang conduct. We disagree.

16

In assessing sufficiency of the evidence, the question is whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318 [61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 576.) We view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Section 186.22, subdivision (b), makes the gang enhancement applicable to any person convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

Martinez acknowledges there was sufficient evidence to prove that he constructively possessed the gun in association with gang members. But he argues there was no evidence of the requisite specific intent. He cites *In re Frank S.* (2006) 141 Cal.App.4th 1192, which reversed a gang enhancement where the minor was a gang member carrying a concealed knife while riding his bicycle alone, but there was no evidence the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. (*Id.* at p. 1199.)

Here, in contrast, Martinez was with other gang members, and they had just left a gang fight, during which one of them held an object of a size consistent with the gun and was challenged to use it by an opposing combatant. Additionally, the cell phone videos showed other gang members holding the gun. Martinez argues there was no evidence the gang fight at the park was criminal activity, and maybe Hernandez acted in self-defense or by mutual consent of combatants. This is pure speculation for which there was no evidence; we can give it no weight.

Palacios argues there was no evidence he actively participated in the fight at the park, and he thinks the jury was required to accept his testimony that he had the gun only

so his father would not find it. However, Palacios did participate, by standing only a few feet away from Hernandez who was in the thick of the fight. Palacios thus backed up his fellow gang member. The jury was not required to accept Palacios's self-serving testimony about having the gun only so his father would not find it.

Substantial evidence supported the section 186.22 finding.

IV

*There Was Sufficient Evidence Martinez Transported the Weapon*

Martinez, who sat in the backseat of the car, argues there is no substantial evidence that he transported the gun, because he had only constructive possession of the gun and did not own or control the car. He claims the trial court erred in denying his motion for new trial based on insufficiency of the evidence.

A trial court may grant a motion for new trial on the ground the verdict is contrary to the evidence. (§ 1181, subd. (6).) In ruling on a motion for new trial, the trial court must weigh the evidence independently, but guided by a presumption in favor of the correctness of the verdict. (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.) A trial court has broad discretion in ruling on a motion for new trial, and on appeal there is a strong presumption the trial court properly exercised that discretion. (*Id*. at p. 524.)

A person may be guilty of unlawful transportation either as a perpetrator or an aider and abettor. (*In re Z.A.* (2012) 207 Cal.App.4th 1401, 1425 (*Z.A.*).) A passenger may be found guilty of transportation if the evidence supports an inference that the passenger aided and abetted the crime, i.e., knew of the presence of the gun and by act or advice aided or promoted the crime with the intent or purpose of facilitating the crime. (*Ibid*.) *Z.A.* held sufficient evidence supported a juvenile court's finding that a passenger knowingly transported marijuana, where there was evidence she went with the driver to pick up the car in which the marijuana was hidden; she knew there were drugs in the car and agreed to attempt to cross the border as a passenger in the car, knowing of the drugs'

18

presence. (*Id.* at p. 1426.) Similarly, *People v. Meza* (1995) 38 Cal.App.4th 1741, held there was sufficient evidence of a passenger's guilt for transporting cocaine, where the trier of fact could infer that the passenger in the vehicle containing drugs "went along to assist" the driver. (*Id.* at p. 1746.)

Here, Martinez acknowledges there was evidence "that he had constructive possession" of the gun including, as mentioned by the trial court, the photo of the gun on Martinez's cell phone. We agree. Martinez backpedals in his reply brief, claiming he only assumed for the sake of argument that there was evidence he had constructive possession. But the evidence is what it is and does not depend on a concession by Martinez.

As to evidence Martinez knew the gun was in the car that day, the trial court said (1) the weapon in evidence was too large to hide and Palacios admitted it did not fit under his seat; (2) the gun would have been visible the multiple times Palacios got out of the two-door car to allow the others to get in and out of the back seat; and (3) even if Martinez did not see the gun in the car he had to see it when he accompanied Hernandez, who carried the gun into the park. The three defendants were lifelong friends and had been driving around in the car for 30 to 60 minutes that day before the police stopped them. That satisfied the possession element.

As to transportation, the court said Martinez chose to accompany his friends and the gun as they drove around that day. He got into the car; he got out of the car at the park; he accompanied Hernandez and the gun into the park; he got back in the car after the fight, knowing the gun was back in the car; and he accompanied his friends to the liquor store with the gun in the car.

Martinez cites evidence and inferences he prefers, e.g., surely the security guard would have been able to identify the object in Hernandez's hand as the assault weapon if that is what it was; Palacios said the gun did not fit under the seat because something was

19

in the way; Palacios said his leg blocked the gun from view; and Palacios did not have to get out of the car to let others in and out but could merely lean forward in the seat.

None of these points render the trial court's decision an abuse of discretion. When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the question is whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, the court will not substitute its deductions for those of the jury, and it is of no consequence that the jury, believing other evidence or drawing different inferences, might have reached a contrary conclusion. (*People v. Castro* (2006) 138 Cal.App.4th 137, 140.)

Martinez is also wrong in arguing he cannot be convicted of unlawful transportation unless he controlled the car. He cites *People v. Emmal* (1998) 68 Cal.App.4th 1313, which did not address culpability of passengers but merely rejected the driver's argument that his driving the vehicle a mere 20 feet was insufficient to constitute transportation. (*Id*. at p. 1318.) *Emmal* said "the evidence need only show that the vehicle was moved while under the defendant's control." (*Ibid*.) *Emmal* did not create a new element that the car be under the defendant's control. The *Z.A.* court rejected the passenger's reliance on *Emmal*. (*Z.A., supra*, 207 Cal.App.4th at pp. 1425-1426.)

Martinez cites *Clark v. Janss* (1940) 39 Cal.App.2d 523, 525, for the proposition that "control" over a vehicle cannot be established by showing he shared a common purpose and destination in traveling with the others. However, *Clark* was a civil case dealing with the question of whether a passenger may share liability when the driver has an accident. (*Id*. at pp. 524-525.) The case has no bearing on this appeal.

We conclude substantial evidence supports the jury's verdict finding Martinez guilty of transportation of the gun, and the trial court did not abuse its discretion in denying the motion for new trial.

*The Trial Court Did Not Err in Rejecting Hernandez's Proposed Jury Instruction*

Hernandez argues the jury might have found he, as the driver of the car, was unaware of the gun until Palacios tossed it into the back seat as the police stopped the car. Hernandez argues that, when the jury raised questions about transportation and possession during deliberations, the trial court erred in refusing to give his proposed instruction about knowledge and control of the firearm. We see no grounds for reversal.

A       Background

When the court and counsel were discussing the jury instructions, Hernandez argued aiding and abetting instructions were inappropriate because the issue was actual or constructive possession. He also advocated but was unable to craft an instruction that would relieve him of culpability if he was unaware of the gun until it was too late to disassociate himself from it, i.e., when the police were stopping the car. The trial court agreed with the prosecution's point that the situation was already covered in the instruction that told the jury that, for possession, it is enough that the person had control of or the right to control the gun.

The trial court instructed the jury on aiding and abetting and instructed the jury that, for the possession charge, the People had to prove the defendant possessed it and knew that he possessed it, and "Two or more people may possess something at the same time. [¶] A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person."

For the transportation charge, the court instructed the jury the People had to prove the defendant (1) transported an assault weapon, (2) knew he possessed it, and (3) knew or reasonably should have known that it had the characteristics that made it an assault weapon. Also, "Two or more people may possess something at the same time. [¶] A

21

person transports something if he or she carries or moves it from one location to another, even if the distance is short. [¶] A person does not have to actually hold or touch something to transport it. It is enough if the person has control over it or the right to control it, either personally or through another person. Proof of his or her knowledge of the character and presence of the item, together with his or her control over the vehicle, is sufficient to establish guilt."

During deliberations, the jury asked, "Does 'possession' of a weapon have a time element? I.e., 'hypothetically' if someone transports a weapon and becomes aware of its presence only minutes before the weapon is discovered, is that sufficient to meet the possession criterion listed in the definition of 'transportation of assault weapon'?"

Hernandez proposed the following answer: "When an individual comes into possession of an illegal firearm or finds himself transporting an illegal firearm without knowing that he has an illegal firearm or is transporting an illegal firearm, and he later learns that he has an illegal firearm or is transporting an illegal firearm, it does not automatically violate Penal Code 12280(a)(1) or 12280(b) 12021(a)(1) or 12021(d) upon acquiring such knowledge. The individual violates the law only if he continues to possess or transport the firearm for an unreasonable time without taking steps to rid himself of the firearm."

The trial court instead instructed the jury: "All of the surrounding circumstances are important in determining whether a defendant 'possessed' a firearm which he did not physically touch or handle. The length of time a defendant was aware of the presence of the firearm, and whether the defendant had control or the right to control the firearm during that period of time, are critical determinations in deciding whether a defendant had 'possession' of a firearm."

The jury sent another note: "We'd like to clarify the definition of transportation of an assault weapon. The text says, 'Proof of his/her knowledge . . . of the item, together with his/her control over the vehicle, is sufficient.' [¶] Is control over a vehicle

22

necessary for transportation of a weapon, or is this clause simply provided as an example of transportation?" (Orig. emphasis.) After discussion with counsel, the trial court responded, "Movement of an assault weapon in a motor vehicle by someone who has knowledge of the assault weapon and has control over the vehicle is an example of how a person could be guilty of a crime of transportation of an assault weapon."

B.      Analysis

Hernandez argues the trial court erred in refusing to use his pinpoint instruction to answer the jury's question.

Section 1138 requires the trial court to clarify any confusion about the law reflected in juror questions during deliberations. Where jury instructions are complete, the trial court has discretion to determine what additional explanation to give the jurors. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

A trial court may reject a pinpoint instruction if it is incorrect, argumentative, potentially confusing, or unsupported by substantial evidence. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) We review de novo the trial court's decision. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) Trial court error is reversible if it is reasonably probable the defendant would have obtained a more favorable result absent the error. (*People v. Earp* (1999) 20 Cal.4th 826, 886-887.) Hernandez, of course, claims trial court error in this case enabled the jury to render a guilty verdict without proper findings as to knowledge and control, requiring reversal unless it appears beyond a reasonable doubt the error did not contribute to the verdict. We see no such federal constitutional issue here.

Hernandez's proposed instruction about possessing the gun "for an unreasonable time" was based on *People v. Jeffers* (1996) 41 Cal.App.4th 917 (*Jeffers*). There, the defendant, a pizza delivery person, delivered a pizza to an apartment and was asked by one of the people there to drop off a package for him. (*Id*. at pp. 919-920.) The

23

defendant delivered a box in a paper bag to a gun shop, saying a friend asked him to deliver it. As the defendant was leaving, the shop owner opened the box, which contained a gun, and asked the defendant for his name, address, and phone number, which the defendant gave him before leaving. (*Id.* at p. 921.) The shop owner then noticed the gun's serial number had been ground off. He contacted the authorities, and the defendant was convicted of possession of a firearm by a felon (§ 12021). (*Id.* at pp. 920-921.) On appeal, he contended the trial court erred in (1) failing to instruct the jury on the required criminal intent and (2) refusing his pinpoint instruction that " 'When an ex-felon comes into possession of a firearm, without knowing that he has a firearm, and he later learns that he has a firearm, he does not automatically violate . . . section 12021(a) upon acquiring knowledge. [¶] The ex-felon violates the law only if he continues to possess the firearm for an unreasonable time, without taking steps to rid himself of the firearm.' " (*Id.* at pp. 920-921.)

The appellate court said the final sentence was legally flawed because it introduced elements of time and reasonableness that are not legally required to establish the offense. (*Jeffers, supra*, 41 Cal.App.4th at p. 924.) Nevertheless, the appellate court found reversible error because (1) the trial court failed to instruct on the requisite union of act and general criminal intent (*id.* at p. 923) and (2) the problem was compounded when the trial court answered a jury question by stating there was no dispute the defendant actually possessed the object and the dispute was whether he knew it was a gun. (*Id.* at pp. 923-924.)

*Jeffers* stated that, although the defendant's proposed pinpoint instruction was flawed, it appeared to be an attempt to focus on the defendant's conduct and what his conduct suggested about intent to control the gun. (*Id.* at p. 924.) If the jury believed he did not know or have reason to suspect he was delivering a gun until he got to the gun shop, then evidence he took immediate steps to relinquish possession would support his

claim that he did not intend to exercise control and his temporary possession was unintentional. (*Ibid.*)

*Jeffers* does not support reversal in this case, because defendant here does not claim any error in the instructions on intent or the required union of act and intent.

*People v. Padilla* (2002) 98 Cal.App.4th 127, 135 (*Padilla*) held defense counsel was not incompetent for failing to request a *Jeffers*-type instruction. In *Padilla*, the defendant was convicted of possession of a firearm by a felon and carrying a concealed firearm as an occupant in a vehicle. (*Id.* at p. 131.) The defendant told police he was unaware of the gun until the driver tossed it to him as the police were pulling the car over, and the defendant stuffed the gun in the seat. (*Id.* at p. 132.) Defense counsel argued to the jury that the defendant put the gun away because " 'What's he supposed to do?' " (*Id.* at p. 135.) *Padilla* rejected reliance on *Jeffers* for the reasons we have already stated, that is, the instructions were sufficient on the issue of intent and the required union of act and intent and added that defense counsel could reasonably conclude a more specific instruction might open a can of worms about inapplicability of the defense of momentary transitory possession where the defendant uses that moment to try to conceal the object from the police. (*Id.* at pp. 135-137.)

VI

*Upper Term - Palacios*

Palacios argues the trial court abused its discretion in sentencing him to the upper term. We disagree.

In exercising its discretion to choose between the lower, middle, and upper terms, the trial court considers both aggravating and mitigating circumstances and any other reasonably related factors. (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420.) A single aggravating factor suffices to make a defendant eligible for an upper-term sentence. (*People v. Black* (2007) 41 Cal.4th 799, 813.)

Here, Palacios advocated for the lower term because he is young (18 years old at the time of these crimes), has a minimal record consisting of "fist fights and delinquency," and there was no evidence he ever fired the gun at a person.

The trial court first denied probation, noting this crime was particularly serious because the gun was an assault weapon. The unattached clip next to the gun contained 24 rounds of ammunition. Palacios had a continuous criminal history as a juvenile and had performed poorly on juvenile probation.

In choosing the upper term for the weapons offense, the trial court found as an aggravating circumstance that Palacios tried to get a 14-year-old to take responsibility for the gun. Palacios's own youth had little mitigating significance in light of his nine convictions or sustained petitions as a juvenile indicating a pattern of criminal activity.

In choosing the upper term for the gang enhancement, the court looked at Palacios's actual commitment to the gang, which was deep. The court found "unsettling" the video of Palacios's fellow gang members brandishing the assault weapon and another gun, "posturing with their guns and . . . basically encouraging [each] other in celebration of a gang possession of firearms." Even more important, said the trial court, was that even Palacios's arrest on the current charges did not diminish his commitment to the gang, as indicated by evidence that Palacios was involved in two gang-related incidents after he was incarcerated on the current charges.

On appeal, Palacios notes the probation report cited as aggravating factors that Palacios had the gun within his reach and was in the company of other gang members. Palacios argues these were improper aggravating factors because they were encompassed in the elements of his offense. However, the trial court did not rely on these factors in choosing the upper term.

Palacios argues the trial court ignored mitigating factors: He was young and had been gainfully employed and had no previous long-term incarceration; the gun was unloaded; no one was hurt; and he quickly admitted his responsibility for the gun.

26

However, the trial court was not required to expressly state its reasons for not finding specific mitigating factors dispositive. The court noted the ammunition was right next to the gun and could be attached in a matter of seconds, and Palacios's youth, which was the only mitigating factor mentioned in the probation report, was outweighed by his extensive criminal activity. Moreover, Palacios lost his gainful employment by failing a drug test, and his admission of responsibility for the gun was in furtherance of his false testimony, rejected by the jury, that he concealed the gun from his fellow gang members.

The trial court properly sentenced Palacios to the upper term.

VII

*Presentence Conduct Credit - Martinez*

Pursuant to section 4019, the trial court gave Martinez conduct credit at the rate of two days credit for every four days spent in presentence custody. Martinez now contends he was entitled to one-for-one credit for the time period from the October 1, 2011, effective date of a section 4019 amendment until the court sentenced him on June 22, 2012.

When Martinez committed these crimes in August 2010, the extant version of section 4019 allowed *some* defendants to earn two days of credit for every two days in custody, but defendants convicted of a serious felony earned only two days credit for every four days in custody. (Stats. 2009-2010 (3d. Ex. Sess.) ch. 28, § 50 (Sen. Bill No. 18), eff. Jan. 25, 2010.) Martinez concedes the gang enhancement made the firearm offense a serious felony for purposes of section 4019 such that he was entitled only to two days of credit for four days in custody.

An amendment effective September 28, 2010, restored the two-for-four rate for everybody. (Stats. 2010, ch. 426, § 2 (Sen. Bill No. 76), eff. Sept. 28, 2010; *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48-49 (*Rajanayagam*).)

27

The 2011 amendment at issue in this appeal was part of the Realignment Act addressing public safety, which shifted custodial responsibilities from the state to the counties and amended section 4019 to allow two days of credit for every two days in custody, including persons convicted of serious felonies. (Stats. 2011, ch. 15, §§ 1, 229, 482 (Assem. Bill No. 109), operative Oct. 1, 2011; § 4019, subds. (a)(6), (f); *Rajanayagam, supra*, 211 Cal.App.4th at p. 49.)

Martinez claims the 2011 amendment is ambiguous because it added to section 4019 a new subdivision (h) that assertedly contains two conflicting sentences. Section 4019, subdivision (h), states "The changes to this section enacted by the [2011 legislation] shall apply prospectively and shall apply to prisoners who are confined to [jail] for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."

Martinez argues the second sentence implies that any days earned after October 1, 2011, shall be calculated at the new rate, regardless when the crime was committed. Martinez invokes the rule of lenity construing an ambiguous criminal statute in the defendant's favor. (*People v. Manzo* (2012) 53 Cal.4th 880, 889 (*Manzo*).) He thinks trial courts must calculate two different rates for persons like him, whose custody time straddles October 1, 2011.

However, the rule of lenity applies only when needed to break a tie between two reasonable interpretations in relative equipoise. (*Manzo, supra*, 53 Cal.4th at p. 889.) We agree with courts that have rejected the interpretation urged by Martinez. *Rajanayagam, supra*, 211 Cal.App.4th 42, held that, although the second sentence of subdivision (h) "confuses matters" (*id*. at p. 51), the defendant's interpretation would ignore the legislative intent expressed in the first sentence. (*Ibid*.) Instead, the second sentence was an inartful attempt to clarify that defendants who committed an offense before October 1, 2011, are to earn credit under the prior law. (*Id*. at p. 52, fn. omitted.) The Legislature's stated purpose for the Realignment Act was to reduce recidivism and

improve public safety, while at the same time reducing corrections and related criminal justice spending. (*Id.* at p. 49, citing § 17.5.) "[I]n choosing October 1, 2011, as the effective date of Assembly Bill No. 109, the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. . . . [W]e will not second-guess the Legislature . . . ." (*Id.* at pp. 55-56.)

Martinez concedes *Rajanayagam*'s interpretation "may be" reasonable but argues his interpretation is more reasonable because one purpose of conduct credits is to give inmates incentive to behave, as stated in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*). *Brown* does not help Martinez's case. *Brown* held the amendment effective January 25, 2010, increasing credits, did not apply retroactively to custody before the amendment's effective date and did not violate equal protection. (*Id.* at pp. 328-330.) The correctional purpose authorizing incentives for good behavior was not served by rewarding those who served time before the incentives took effect. (*Ibid.*) But since the defendant in *Brown* had already been sentenced when the amendment took effect, that case did not present the issue we face about whether an amendment prospectively applies to persons who committed crimes before the amendment's effective date but have not yet been sentenced. Additionally, *Rajanayagam* noted that, although *Brown* contained some language supporting calculation of a person's credits at two different rates, the amendment there at issue did not contain an express legislative intent whether the amendment was to apply retroactively or prospectively. (*Rajanayagam, supra*,

29

211 Cal.App.4th at p. 52, fn. 4.)  We note the California Supreme Court granted review in *People v. Olague* (2012) 141 Cal.Rptr.3d 185, where a defendant sentenced before the October 2011 amendment sought retroactive application, but the Court dismissed review on March 20, 2013, in light of *Brown*.

Martinez argues the 2011 amendment must be applied to his custody after October 1, 2011, in order to avoid an equal protection violation.  We disagree.

The two groups are (1) defendants in custody on or after October 1, 2011, for a crime committed before that date, and (2) defendants in custody on or after October 1, 2011, for a crime committed after that date.  Martinez cites *Rajanayagam* for its statement that these groups are similarly situated because both have an incentive to behave in custody but a defendant who committed a crime before the effective date of the amendment is rewarded less.  (*Rajanayagam, supra*, 211 Cal.App.4th at pp. 53-54.)  However, *Rajanayagam* concluded there was no equal protection violation because a rational basis supported the distinction in that the Legislature took a measured approach in balancing of cost savings against public safety.  (*Id*. at pp. 55-56; see also, *People v. Kennedy* (2012) 209 Cal.App.4th 385, 398-399 [Legislature could have rationally concluded that by making the 2011 amendment's application depend on the date of the offense, they were preserving the deterrent effect of the criminal law as to those crimes committed before that date].)

We conclude the trial court properly calculated the section 4019 credits.

We conclude defendants fail to show any basis for reversal of the judgments.

DISPOSITION

The judgments against all three defendants are affirmed.


      HULL          , J.


We concur:


      NICHOLSON     , Acting P. J.


      BUTZ          , J.